CHARLES M. LAHR, Appellee, v. CHICAGO & NORTH WESTERN RAILWAY COMPANY, Appellant, et al.

No. 40470.

JANUARY 13, 1931.

REHEARING DENIED MAY 6, 1931.

Sims & Page, Elizabeth Hyde and Davis, McLaughlin & Hise, for appellant.

Lower & Sheehan, and L. W. Powers, for appellee.

GRIMM, J.—Dow City is a small station on the line of the Chicago & North Western Railway Company, in the western part of Crawford County, Iowa. The line of the railroad running from Chicago to Omaha is at that point double tracked and the depot is on the south side of its tracks. The stock yards at said station are situated south of the main line tracks and also south of the spur track and located east of the station approximately 500 feet. The stock yards and other industries are served by an industry track, which is taken off the south main line track at a point approximately 700 feet west of the depot building. The town is located south of this industry track. The station *grounds* extend easterly from the east edge of the stock yards approximately 250 feet and approximately 850 feet east of the east edge of the depot building. From that point on east there extends the ordinary fenced private right-of-way of the railway company, 100 feet in width.

· The industry track is not connected at its easterly end with the main line. It is located for a goodly portion of its length about 100 feet south of the south edge of the depot. It is approximately 1550 feet long. Approximately 1100 feet east of the east line of the depot is a little draw which contains a culvert. About 2400 feet east of the depot is a highway crossing designated in the case as ''the old Lincoln highway'', and about 50 feet east of the easterly line of this old Lincoln Highway crossing is the defendant Railway Company's bridge No. 886½, where the plaintiff was injured. This bridge is approximately 25 feet long inside of the abutments at the top. The space between the abutments is narrow on account of the three offsets so that the bottom of the abutments are only about 13 feet apart. The top of the bridge is approximately 23 feet from the bottom of the stream. These main line tracks run practically east and west. Under the method of operating the North Western Railway the west bound trains run on the south track and the east bound trains run on the north track.

The bridge where the accident happened is approximately 2400 feet east of the center of the depot. On both the east and west side of the highway crossing (old Lincoln Highway) there were wing fences, of the customary type, with two boards at the top extending on each side of the highway from the right-of-way lines to the railway track and were white-washed white.

From the end of the wing fence and from the top of the last post another post slopes down at an angle of about 45 degrees to the ballast at the end of the ties. The bottom of the slanting post of the wing fence is two feet from the end of ties, and three feet, eight inches from the center of rail. The overhang of a standard car extends beyond the end of the ties about two feet, four inches beyond the center of the rail. The south edge of the top of the bridge was four feet, three inches south of the south rail of the railroad track.

On April 19, 1928, the defendant D. L. Graul was the station agent of the defendant company at Dow City. He had been so employed for many years and was the sole employe of the Company at that station. When he was off duty the station was closed. His hours were from 8 o'clock in the morning to 5 o'clock in the afternoon. The plaintiff was born in January, 1866, and since 1914 he has lived 5½ miles south of Dow City. For about twenty years prior to 1914 he lived in Crawford County and had been shipping stock out of Dow City. He owned and operated a 300 acre farm and was engaged in farming, stock raising, and stock feeding and shipping. Some time about the middle of April, 1928, the plaintiff telephoned Graul and ordered two stock cars for the 19th of April, for the shipment of two carloads of cattle to Omaha, Nebraska. The cars were furnished and on April 19th the plaintiff drove 59 head of steers to Dow City and placed them in the stock yards. This happened about half past twelve, noon. The plaintiff then went to the depot where he found a young student learning the clerical work of a station agent, but who was not in the service of the Railway Company and received no salary. This young man undertook to make out a livestock contract for the plaintiff for the shipment of his stock to Omaha. As the plaintiff was leaving the station Graul came in. A conversation ensued in reference to the livestock contract and Graul corrected it. We quote from the abstract the conversation which occurred between Graul and the plaintiff, at the time and immediately after Graul made some corrections in reference to the plaintiff's pass on the livestock contract. Plaintiff asked Graul when the train would arrive. Graul said, according to plaintiff's evidence:

" 'You never can tell about these freight trains, but it is due about half-past nine.' After he fixed the pass up so I could

come home on it, he (Graul) says, 'it will be all right now to go and come back on.'

"Q. And did you say anything further to him?

A. Yes.

Q. What did you say?

A. I asked him if they stopped at the depot; he said, no, that I had to hurry down and get on the caboose.

Q. And did you ask him or was there anything said about where the caboose was stopped?

A. Somewhere east of the depot.

Q. Did he say that to you?

A. No, not particularly.

Q. He merely said you would have to hurry down the track to get on the train at the back end of the depot?

A. Yes, the back end east."

On this subject Graul testified as follows:

"I have no recollection of Mr. Lahr asking me whether the train would stop at the depot or how he was to get on the train or anything about that. I did not tell him he would have to get on the train while the engine was picking up his stock and putting it in the train. Stockmen were required to board the train at the platform."

The plaintiff left the depot about one o'clock in the afternoon and went back to his farm. He returned to Dow City about five o'clock when, with the help of his sons, the cattle were loaded into the stock cars. The plaintiff then went up town to a restaurant where he procured his supper, and waited for the arrival of the train which was due to arrive about 9:30 P.M. Plaintiff heard the train whistle and started towards the depot. The plaintiff says, after he heard the train whistle:

"I then went down toward the depot and got down to the depot about half past nine. At that time the engine just pulled by the depot. I went to the edge of the platform of depot about thirty feet from the train and started back to the east end of the train. The train had not come to a stand still when I started walking down toward the caboose but came to a stop pretty quick. The train was going west and I walked back on the south side. I had in my possession the transportation to Omaha and

back. In proceeding back from the depot I walked right along the side of the cars.''

On cross examination plaintiff says:

''I was about a block from the depot in a restaurant when I heard the whistle. It was where I got my supper and I had stayed there during the evening. I was about thirty or forty feet from the depot when the engine passed. The two tracks were about 100 feet apart. I just went to the edge of the depot platform, which is east of the depot building and when I got there the locomotive had already gone by. I did not get on the platform but when the train came almost to a stop I started to go down east. The locomotive was then several car lengths west of the depot. The depot itself was between me and the train as the train was going by.''

Relative to his trip towards the caboose, the plaintiff said:

''The night was awfully dark. No moon shining. I walked so close to the train that I bumped into it with my shoulders a couple of times. So I held my hand to kind of guide me as I walked down and I walked a pretty good step. I could see better farther off than close to me. * * * I was walking on the gravel all the way and immediately adjacent to the train and could feel the train with my left hand as I went along. I did not know where I was until I started to fall and when I fell in there it knocked the wind out of me. * * * I could see the cars as I walked along them but could not see whether they were stock cars or box cars.''

Further on cross examination the plaintiff said:

''I walked along the train anyhow a half mile, and it might be more. I knew there was a highway crossing, I crossed when I used to go to Arion. I had crossed it in going to Arion and I knew the crossing was there. I never saw the ditch right alongside of the crossing and did not know it was there but I had crossed it a mile south. I did not know just how close it was to the highway crossing but I knew it was on the east side of that highway crossing. I did not think about that ditch as I walked along. I did not see the highway crossing as I walked along. I thought about the crossing but I did not see

any crossing. I did not see those white-washed boards of the wing fence or these white posts. I suppose they were there, but I did not see them. I was not looking for anything. Just looking my way down the track. I was walking along pretty fast at a good step. I did not see any crossing there, but I was looking for it because I knew there was a crossing there.

Q. And you had that in your mind as you walked along?

A. No, I didn't say that.

Q. Then you weren't thinking about it?

A. I thought about it at times.

Q. You thought you were getting pretty close to that highway?

A. I was wondering if I was going to get down to the crossing.

Q. You were wondering if you were going to get down to the crossing?

A. Yes.

Q. And were you wondering if you were going to get down to that ditch?

A. I didn't think nothing about that ditch.

Q. But you did know there was a ditch there close to the crossing?

A. No, sir, I didn't know how close.

Q. But you knew it was there in the vicinity of the crossing, didn't you?

A. I knew it was in the neighborhood there.

Q. You didn't observe that wing fence, didn't see it on the west side of the crossing?

A. I didn't see it.

Q. Nor you didn't observe the white wing fence on the east side of the crossing?

A. I didn't see it.''

On April 23, 1928, the plaintiff signed a typewritten statement, prepared in his presence, on a portable typewriter, by an investigating claim agent of the company. At the close of the typewritten portion, the plaintiff wrote in his own handwriting, ''I have read this it is true''. This written statement contains no reference to any instruction by Graul.

The plaintiff testified further in reference to the accident as follows:

"I did not see the bridge when I walked on it. The train was still standing still. * * * It was probably ten minutes after I fell that the conductor found me. The train was standing still after I fell. I waited until the train moved up and could see the way car or the light on it, and then I hollered and the train was brought to a stop. The conductor came and found me. * * * He said he could not get me out alone and would go to the depot and get a doctor. * * * He came back pretty promptly and they got me out and took as good care of me as they could.

"I did not see any member of the train crew as I walked down to get on the train. I did not see Agent Graul after signing the contract. I knew that he went off duty at five o'clock in the afternoon. I understood that."

In the meantime, the train, consisting of 79 cars, had stopped with the engine west of the depot and five or six car lengths east of the industry track switch. The caboose stood about six car-lengths east of the bridge when the accident happened. The engine was uncoupled and turned in on the industry track. There were several cars on the industry track between the east end of the switch and the cars containing plaintiff's stock. This string of cars was pulled out on the main line, the plaintiff's cars were pushed back on to the train; the other cars were replaced and spotted on the industry track; the engine was again run out of the main line and connected on the train. As the train pulled into town both brakemen were riding on the engine, and, on passing the depot, the rear brakeman dropped off to get the waybills for the stock that was to be picked up at that station. The head brakeman cut off the engine and handled the switching. The conductor was the only member of the train crew on the rear end of the train, and he was acting in the capacity of both conductor and rear brakeman.

When the train stopped the engineer whistled the flagman out to protect the rear end of the train and when the switching was done the flagman was "whistled in". Approximately twelve or fifteen minutes were consumed between the time of the stopping of the train and the calling in of the flagman (conductor). On arriving at the caboose the flagman (conductor) gave a signal to proceed. As the train proceeded slowly towards the west and the caboose was passing over the culvert into which the

plaintiff had fallen, the conductor heard a call and stopped the train. He then went back and by the aid of a flashlight which he had in his possession, he discovered the plaintiff in the bottom of the culvert. The conductor immediately summoned assistance, and the plaintiff was promptly taken to the hospital where he was cared for.

Paragraph 8 of plaintiff's petition, which contains his allegations of negligence, is as follows:

"Plaintiff further alleges that the injuries caused to and sustained by him were due to, caused and brought about by the joint and concurrent negligence and carelessness of the said defendants, and each of them in the following particulars, to wit:

"a. That the defendants, and each of them, were careless, reckless and negligent in failing and neglecting to provide the plaintiff a safe place to board its said train.

"b. That the defendants, and each of them, were careless, reckless and negligent in directing the plaintiff to proceed along said train to the east to board the same, which led plaintiff to the bridge from which he fell and was injured.

"c. That the defendants, and each of them, were careless, reckless and negligent in neglecting and failing to inform the plaintiff of the location of said bridge and of the danger in passing thereover.

"d. That the defendants, and each of them, were careless, reckless and negligent in stopping its said train so that the caboose provided for the carrying of passengers and the plaintiff thereon was beyond the bridge hereinbefore described and over which plaintiff would have to pass to board said caboose, well knowing that said bridge was not of sufficient width for plaintiff to pass over and well knowing that said condition could not be seen in the darkness, and well knowing that the plaintiff, in attempting to pass thereover, might or probably would fall off the same and be injured or when, by the exercise of reasonable care, the defendants knew or should have known that plaintiff could not see said bridge or hole and the condition thereof and would, in all probability, fall and be injured in trying to pass over the same.

"e. That the defendants, and each of them, were careless, reckless and negligent in failing to stop the caboose of said

train at a point where plaintiff could safely reach and board the same.

"f. That the defendants, and each of them, were careless, reckless and negligent in failing to provide plaintiff with a safe passageway to its said caboose where said defendants required plaintiff to board the same.

"g. That the defendants, and each of them, were careless, reckless and negligent in failing to provide a light or other warning to inform or advise plaintiff of the location and presence of said bridge and of the danger in passing over the same.

"h. That the defendants, and each of them, were careless, reckless and negligent in neglecting and failing to stop said train so that the caboose on which the defendants, and each of them, knew plaintiff was to take passage, would be located in a safe place for plaintiff to board the same.

"i. That the defendants, and each of them, were careless, reckless and negligent in directing the plaintiff to a place of danger in order for the plaintiff to board the caboose of said train.

"j. That the defendants, and each of them, were careless, reckless and negligent in failing and neglecting to warn or inform the plaintiff of the location and condition of said bridge, well knowing of the location and condition thereof."

The plaintiff pleaded freedom from contributory negligence. The defendant answered by way of a general denial and alleged that the plaintiff's injuries were due to contributory negligence on the part of the plaintiff. At the trial the defendant requested nineteen instructions, all of which were refused, and proper and timely exceptions were taken thereto.

The court gave twenty-two instructions, to which timely and proper exceptions were taken by the defendant. Four forms of verdict were given by the court. The second form provided for a verdict against the defendant Chicago & North Western Railway Company.

On April 11, 1929, the jury returned a verdict on the second form. A motion for a new trial was filed on April 24, 1929. On May 21, 1929, the court made this entry: "Motion for New Trial and Exceptions to Instructions argued by counsel and submitted, to be determined in vacation or in term. Motion for judgment in favor of defendant Graul is sustained." A judg-

ment entry was accordingly made. The motion for a new trial, so far as the defendant Company is concerned, was overruled November 23, 1929, and judgment was entered against the defendant Company on the 21st day of January, 1930. There are 89 errors relied upon for reversal, some of which, however, are somewhat in duplication of others.

Manifestly, if the defendant Railway Company was guilty of any actionable negligence in this case, it was because of the negligence of the defendant Graul on account of his instructions to the plaintiff in reference to boarding the caboose. It cannot be consistently claimed that there was any negligence on the part of the defendant company in the construction or maintenance of its culvert into which the plaintiff fell, except as the plaintiff hinges the same upon the instructions of Graul to the plaintiff.

The plaintiff accounts for himself outside of the station grounds and down on the company's private right-of-way to the point of the accident by reason of Graul's instructions to the plaintiff in reference to boarding the caboose.

It is claimed the defendant Railway Company is negligent on the theory of *respondeat superior*. It necessarily follows that if Graul was not negligent the Railway Company cannot be held to have been negligent.

The jury did not find against the defendant Graul, but on the other hand used the form of verdict finding against the Railway Company. Following this verdict, a judgment was entered by the Court in favor of the defendant Graul, and from that judgment, there is no appeal.

In Hobbs v. Railroad Company, 171 Iowa 624, suit was brought against the Railway Company and certain railway employees for alleged damages to the plaintiff resulting from being wrongfully ejected from a train, and this court said:

"Where the real actor (who is none the less liable personally because acting for another) is not guilty, it necessarily follows that the party for whom he acted cannot be."

In discussing the difference between suits against two different persons as joint tort feasors, and against a master and servant, based solely upon the alleged fault of the servant, the

court, quoting from Doremus v. Root, 63 Pac. 572 (Wash.), said:

" 'But the defendants in this character of action are in no sense joint tort feasors, nor does their liability to the plaintiff rest upon the same or like grounds. * * * For injuries caused by the negligent act of an employee not directed or ratified by the employer, the employee is liable because he committed the act which caused the injury, while the employer is liable, not as if the act was done by himself, but because of the doctrine of *respondeat superior*—the rule of law which holds the master responsible for the negligent act of his servant, committed while the servant is acting within the general scope of his employment, and engaged in his master's business. The primary liability to answer for such an act, therefore, rests upon the employee, and when the employer is compelled to answer in damages therefor he can recover over against the employee.' "

The court further says:

"The principle so clearly expressed has been approved by this Court in White v. International Text Book Co., 150 Iowa 27, followed in Dunshee v. Standard Oil Co., 165 Iowa 625, and is sustained by the overwhelming weight of authority. * * * Where the real actor (who is none the less liable personally because acting for another) is not guilty, it necessarily follows that the party for whom he acted cannot be."

In the case at bar the jury exonerated Graul, and in doing so necessarily exonerated the Company. See, also, Arnett v. Illinois Central Railway, 188 Iowa 540; Maine v. Maine & Sons, 198 Iowa 1278. Inasmuch as the jury found for the defendant Graul and judgment on the finding was entered in favor of Graul, it necessarily follows that the plaintiff cannot, under the record in this case, claim negligence against the defendant Company and recover thereon. Many other errors are complained of, but it is unnecessary to discuss them. The plaintiff cannot recover. For the errors already pointed out, the cause must be and is,—Reversed.

Faville, C. J., Evans, Morling, De Graff, Wagner, Albert, and Kindig, JJ., concur.